Michael Zhang (OSB No. 185180)
Qiu-Qiu Law
5020 Martin Luther King Blvd., Suite S
Portland, Oregon 97211
michael@qiu-qiulaw.com
908-938-6683

Attorney for *Gabbert* Plaintiffs
Additional attorneys listed on next page

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF OREGON**
**PORTLAND DIVISION**

| | |
|---|---|
| MARTIN LYNCH, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>MULTNOMAH COUNTY, et al.,<br><br>Defendants. | Case No. 3:23-cv-01502-IM (lead case)<br><br>***GABBERT* PLAINTIFFS' MOTION FOR CERTIFICATION OF CLASS CLAIMS AGAINST JOSEPHINE AND KLAMATH COUNTIES**<br><br>Request for Oral Argument |
| JEFFREY SAWYER, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>MARION COUNTY, et al.,<br><br>Defendants. | Case No. 3:23-cv-01971-IM |
| MATTHEW GABBERT, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>JOSEPHINE COUNTY, et al.,<br><br>Defendants. | Case No. 1:23-cv-01434-IM |

| | |
|---|---|
| JERRY BAKER,<br><br>Plaintiff,<br><br>v.<br><br>BAKER COUNTY,<br><br>Defendant. | Case No. 2:24-cv-01503-IM |

Akeeb Dami Animashaun
355 S. Grand Ave., Suite 2450
Los Angeles, California 90071
dami@animashaun.me
929-266-3971

Jacob Loup
Law Office of Jacob Loup
400 Corporate Pointe, Suite 300
Culver City, California 90230
jl@louplaw.com
347-391-5009

Shakeer Rahman
Law Office of Shakeer Rahman
3435 Wilshire Blvd., Suite 2910
Los Angeles, California 90010
shakeer@loosr.net
323-546-9236

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ v

INDEX OF EXHIBITS ........ viii

LOCAL RULE 7-1 CERTIFICATION ........ 1

MOTION ........ 1

MEMORANDUM IN SUPPORT ........ 3

INTRODUCTION ........ 3

FACTUAL BACKGROUND ........ 3

1. Josephine and Klamath Counties foreclosed on Plaintiffs' properties, sold the properties, and kept the surplus proceeds. ........ 4

2. Defendants both followed the same essential policy and practice when taking and selling tax-delinquent properties and denying former owners any way of claiming just compensation for the surplus proceeds. ........ 6

3. From the evidence Defendants have disclosed in discovery, Plaintiffs can readily identify all properties included in the putative class and calculate, formulaically, the surplus proceeds to which each class member is entitled... 9

4. The Counties continue to hold unsold properties but intend to sell them at auction imminently. ........ 12

ARGUMENT ........ 13

1. Preliminarily, the Court should reconsider its previous statute-of-limitations ruling and hold that the limitations period for *Tyler* claims based on sold properties begins to run only once the property is sold and the surplus proceeds are realized. ........ 13

2. Applicable legal principles ........ 19

2.1. Standards for certifying a class ........ 19

2.2. The elements of federal and state takings claims ........ 19

3. The proposed class satisfies the four requirements of Rule 23(a). ......... 21

3.1. Numerosity/impracticability (Fed. R. Civ. P. 23(a)(1)) ................. 21

3.2. Commonality (Fed. R. Civ. P. 23(a)(2)) ......................................... 22

3.3. Typicality (Fed. R. Civ. P. 23(a)(3)).............................................. 23

3.4. Adequacy (Fed. R. Civ. P. 23(a)(4)) ............................................... 24

4. The proposed class satisfies Rule 23(b)(3). ............................................ 26

4.1. Predominance ................................................................................. 26

4.2. Superiority ...................................................................................... 29

5. The Court should appoint undersigned counsel as class counsel. .......... 30

CONCLUSION ......................................................................................... 31

## TABLE OF AUTHORITIES

### Cases

*A. B. v. Haw. State Dep't of Educ.*,
30 F.4th 828 (9th Cir. 2022) .......... 21

*Abdullah v. U.S. Sec. Assocs., Inc.*,
731 F.3d 952 (9th Cir. 2013) .......... 22

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) .......... 24

*Boling v. United States*,
220 F.3d 1365 (Fed. Cir. 2000) .......... 17

*City of Los Angeles v. Santa Monica Baykeeper*,
254 F.3d 882 (9th Cir. 2001) .......... 13

*Dependable Highway Express, Inc. v. Navigators Ins. Co.*,
498 F.3d 1059 (9th Cir. 2007) .......... 16

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) .......... 22, 23, 24, 25

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147 (1982) .......... 24

*Gen. Tel. Co. of the Nw., Inc. v. EEOC*,
446 U.S. 318 (1980) .......... 21

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) .......... 22, 25

*Hanney v. Epic Aircraft, LLC*,
No. 6:21-cv-01199-MK, 2024 WL 2106210 (D. Or. May 10, 2024) .......... 21

*Hanon v. Dataproducts Corp.*,
976 F.2d 497 (9th Cir. 1992) .......... 23, 24

*Hartzell v. Marana Unified Sch. Dist.*,
130 F.4th 722 (9th Cir. 2025) .......... 13

*Jimenez v. Allstate Ins. Co.*,
765 F.3d 1161 (9th Cir. 2014) .......... 22

*Kelly v. Aramark Servs., Inc.*,
815 F. Supp. 3d 1043 (N.D. Cal. 2025) .......... 24, 26

*Loc. Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*,
244 F.3d 1152 (9th Cir. 2001) .......... 27

*Lott v. Vial Fotheringham, LLP*,
No. 3:16-cv-00419-HZ, 2020 WL 1890539 (D. Or. Apr. 15, 2020) .......... 21

*Lynch v. Multnomah Cnty.*,
No. 1:23-cv-01434-IM, 2024 WL 5238284 (D. Or. Dec. 27, 2024) .......... 3, 14, 18, 20

*Moss v. U.S. Secret Serv.*,
No. 1:06-cv-3045-CL, 2015 WL 5705126 (D. Or. Sept. 28, 2015) .......... 21, 22

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) .......... 27

*Pecover v. Elec. Arts Inc.*,
No. C 08–2820 VRW, 2010 WL 8742757 (N.D. Cal. Dec. 21, 2010) .......... 22

*Pung v. Isabella Cnty.*,
146 S. Ct. 1964 (2026) .......... 14, 21

*Ridgeway v. Walmart Inc.*,
946 F.3d 1066 (9th Cir. 2020) .......... 27

*Scholes v. Stone, McGuire & Banjamin*,
143 F.R.D. 181 (N.D. Ill. 1992) .......... 22

*Sikorsky v. City of Newburgh*,
136 F.4th 56 (2d Cir. 2025) .......... 14

*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Plan. Agency*,
535 U.S. 302 (2002) .......... 20

*Tyler v. Hennepin Cnty.*,
598 U.S. 631 (2023) .......... 3, 14, 19, 20

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 442 (2016) .......... 26

*United States v. Dickinson*,
331 U.S. 745 (1947) .......... 17, 18

*United States v. Lawton*,
110 U.S. 146 (1884) .................................................................................... 14

*Van v. LLR, Inc.*,
61 F.4th 1053 (9th Cir. 2023) .......................................................................... 19

*Vaquero v. Ashley Furniture Indus., Inc.*,
824 F.3d 1150 (9th Cir. 2016) .......................................................................... 27

*Wallace v. Kato*,
549 U.S. 384 (2007) ................................................................................ 16, 18

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .................................................................................... 22

*Wang v. Chinese Daily News*,
737 F.3d 538 (9th Cir. 2013) .......................................................................... 22

*White v. Symetra Assigned Benefits Serv. Co.*,
104 F.4th 1182 (9th Cir. 2024) ........................................................................ 19

*Wolin v. Jaguar Land Rover N. Am., LLC*,
617 F.3d 1168 (9th Cir. 2010) .......................................................................... 29

*Zeyen v. Bonneville Joint Dist.*,
114 F.4th 1129 (9th Cir. 2024) ........................................................................ 20

**Statutes**

Oregon Const., art. I, § 18 ............................................................................ 20

ORS § 275 ................................................................................................ 7, 8

U.S. Const., amend. V .................................................................................... 20

**Rules**

Fed. R. Civ. P. 23 ................................................................................ 19, 30

**Treatises**

*Federal Practice and Procedure*, § 1779 (3d ed. 2005) ........................................... 29

# INDEX OF EXHIBITS

| | |
|---|---|
| Ex. 1 | Josephine List |
| Ex. 2 | Klamath List |
| Ex. 3 | Deed Conveying Gabbert Property to Josephine County, Mar. 10, 2021 |
| Ex. 4 | Order Designating Gabbert Property as a Public Park, Oct. 13, 2021 |
| Ex. 5 | Order Authorizing Sale of Gabbert Property, Oct. 13, 2021 |
| Ex. 6 | Order Confirming Sale of Gabbert Property, Jan. 5, 2022 |
| Ex. 7 | Dep. Tr. of Eva L.I. Arce, Frmr. Josephine County Tax Collector |
| Ex. 8 | Defs.' Resps. to Pls.' First Requests for Admissions, June 10, 2026 |
| Ex. 9 | Mitchell Foreclosure Judgment, Nov. 20, 2020 |
| Ex. 10 | Deed Conveying Mitchell Property to Klamath County, Nov. 22, 2022 |
| Ex. 11 | Notice of Foreclosure Sale of the Mitchell Property |
| Ex. 12 | Dep. Tr. of Kayla Wessel, Klamath County Tax Collector |
| Ex. 13 | Dep. Tr. of Helene Lulich, Josephine County Property Manager |
| Ex. 14 | Dep. Tr. of Terry Wells, Klamath County Property Manager |
| Ex. 15 | Defs.' Supp. Responses to Pls.' Second Interrogs. |
| Ex. 16 | Josephine County Spreadsheet Produced in Response to Interrogatory No. 8 Listing Claimed Allowable Costs |
| Ex. 17 | Josephine County Spreadsheet Cost Calculator Parameters |
| Ex. 18 | Stipulation, Aug. 27, 2026 |
| Ex. 19 | Decls. of Plaintiffs Matthew Gabbert, Kelly Gabbert, and Darren Mitchell |
| Ex. 20 | Decl. of Akeeb Dami Animashaun |

## LOCAL RULE 7-1 CERTIFICATION

Pursuant to Local Rule 7.1, Plaintiffs conferred with Defendants Josephine County and Klamath County regarding this motion. Defendants have indicated that they oppose the motion and will submit a written response.

## MOTION

Plaintiffs Matthew Gabbert, Kelly Gabbert, and Darren Mitchell, by and through undersigned counsel, and on behalf of themselves and the members of the alternative proposed classes, hereby move for certification of their claims against Defendants Josephine County and Klamath County pursuant to Rules 23(b)(3) and 23(c)(4) of the Federal Rules of Civil Procedure. In support of this motion, Plaintiffs rely on the accompanying memorandum of law and attached exhibits. As set forth more fully therein, Plaintiffs respectfully request:

1. That the Court reconsider its previous ruling that the statute of limitations in this action began to run when the statutory redemption period expired, rule instead that the limitations period began to run upon the county defendants' sales of taken properties, and certify the following class:

   All persons and entities—and their heirs, successors, and assigns—who held an ownership interest in, or a valid lien against, real property, where (1) Defendants Josephine County or Klamath County acquired the property through a tax-foreclosure proceeding to satisfy unpaid real property taxes or other county or local governmental taxes, fees, or assessments; and (2) such persons or entities did not receive the notice required by H.B. 2089 (2025); and (3) Josephine County or Klamath County *sold the property*, on or after October 12, 2017, for an amount exceeding the sum of the unpaid taxes, fees, and the Counties' out-of-pocket costs incurred in maintaining or selling the property.

2. In the alternative, if the Court declines to reconsider its previous statute-of-limitations ruling, that the Court certify the following class:

All persons and entities—and their heirs, successors, and assigns—who held an ownership interest in, or a valid lien against, real property, where (1) Defendants Josephine County or Klamath County acquired the property through a tax-foreclosure proceeding to satisfy unpaid real property taxes or other county or local governmental taxes, fees, or assessments; and (2) the *statutory redemption period for the property expired* on or after October 12, 2017; and (3) such persons or entities did not receive the notice required by H.B. 2089 (2025); and (4) Josephine County or Klamath County subsequently sold the property for an amount exceeding the sum of the unpaid taxes, fees, and the Counties' out-of-pocket costs incurred in maintaining or selling the property.

3. That the Court appoint Plaintiffs Matthew Gabbert, Kelly Gabbert, and Darren Mitchell as representatives of the proposed class.

4. That the Court appoint Michael Zhang (Qiu-Qiu Law); Akeeb Dami Animashaun, Esq.; Jacob Loup (Law Office of Jacob Loup); and Shakeer Rahman (Law Office of Shakeer Rahman) as class counsel for the proposed class pursuant to Federal Rule of Civil Procedure 23(g).

## MEMORANDUM IN SUPPORT

## INTRODUCTION

Plaintiffs bring federal and state constitutional claims seeking just compensation for the surplus sale proceeds that Defendants Klamath County and Josephine County (the "Counties" or "Defendants") kept after seizing putative class members' properties through tax foreclosures. This Court already has held that the takings alleged by Plaintiffs violated the Takings Clauses of the United States and Oregon Constitutions. *See Lynch v. Multnomah Cnty.*, No. 1:23-cv-01434-IM, 2024 WL 5238284, at *7–8, *16 (D. Or. Dec. 27, 2024). Now, after conducting discovery, Plaintiffs can show that they are able to readily, efficiently prove both liability and damages on a classwide basis by formulaically applying data provided by Defendants. Regardless of which of the two alternative proposed class definitions this Court adopts, this case satisfies the requirements of Federal Rules of Civil Procedure 23(a) and 23(b)(3), and this Court should appoint Plaintiffs Matthew Gabbert, Kelly Gabbert, and Darren Mitchell as class representatives and the undersigned as class counsel.

## FACTUAL BACKGROUND

Before *Tyler v. Hennepin County*, 598 U.S. 631 (2023), Defendants each maintained a longstanding policy of foreclosing on and taking title to real property with unpaid tax debts, then selling the properties and keeping all the sale proceeds, even when that amount exceeded the taxes, fees, and costs owed. Plaintiffs

Matthew Gabbert, Kelly Gabbert, and Darren Mitchell were victims of this course of conduct, as were the putative class members they seek to represent.

**1. Josephine and Klamath Counties foreclosed on Plaintiffs' properties, sold the properties, and kept the surplus proceeds.**

In 2018, Plaintiffs Matthew and Kelly Gabbert (the "Gabberts") owned property located at 205 S. Marble Drive in Grants Pass, Oregon (the "Gabbert Property"), when Josephine County initiated tax-foreclosure proceedings over $1,541.25 in unpaid property taxes, resulting in the entry of a General Judgment and Order of Sale foreclosing the property. Ex. 3 (Deed Conveying Gabbert Property to Josephine County, Mar. 10, 2021). Under Oregon law, the Gabberts had two years to redeem the property, but they were unable to do so and title to the property was deeded to Josephine County. *Id.*

Josephine County designated the Gabbert Property for public use as county forest, park, or recreation area, and, the very same day, re-designated it for sale. *See* Ex. 4 (Order Designating Gabbert Property as a Public Park, Oct. 13, 2021); Ex. 5 (Order Authorizing Sale of Gabbert Property, Oct. 13, 2021). As explained below, *see infra* pp. 7–8, Josephine made this initial public-use designation to circumvent an Oregon law that otherwise would have required the County to distribute sale proceeds among its local taxing districts rather than retain the proceeds exclusively for itself.

Josephine then sold the Gabbert Property at auction. The sale price of $97,770 exceeded the Gabberts' tax debt by nearly $88,000. Ex. 6 (Order Confirming Sale of Gabbert Property, Jan. 5, 2022); Ex. 1 (Josephine List) at No. 12. At no point

during the foreclosure process did Josephine inform the Gabberts that it intended to sell the Gabbert Property, that the sale might generate surplus proceeds, or that the Gabberts could recover any surplus generated by the sale. Ex. 7 (Dep. Tr. of Eva L.I. Arce, Frmr. Josephine County Tax Collector) at 35:2–36:16. Nor did Josephine provide the Gabberts any process or opportunity to claim, apply for, or recover surplus proceeds after the sale. Ex. 8 (Defs.' Resps. to Pls.' First Requests for Admissions, June 10, 2026) at Admissions Nos. 1–4.

In 2020, Plaintiff Darren Mitchell owned property located at 931 Lincoln Street in Klamath Falls, Oregon (the "Mitchell Property") when Klamath County initiated tax-foreclosure proceedings based on $5,966.34 in delinquent property taxes, resulting in the entry of a General Judgment foreclosing the property. Ex. 9 (Mitchell Foreclosure Judgment, Nov. 20, 2020). Under Oregon law, Mitchell had two years to redeem the property, but he was unable to do so, and title to the Mitchell Property was deeded to Klamath County. Ex. 10 (Deed Conveying Mitchell Property to Klamath County, Nov. 22, 2022).

After taking title, Klamath sold the Mitchell Property at a foreclosure auction. Ex. 11 (Notice of Foreclosure Sale of the Mitchell Property) The sale price of $25,000 exceeded Mitchell's tax debt by more than $13,000. Ex. 2 (Klamath List) at 7. At no point during the foreclosure process did Klamath inform Mitchell that the sale might generate surplus proceeds, or that he could recover any surplus generated by the sale. Ex. 12 (Dep. Tr. of Kayla Wessel, Klamath County Tax Collector) at 29:2–10, 30:16–31:4. Nor did Klamath provide Mitchell any process or

opportunity to claim, apply for, or recover surplus proceeds after the sale. Ex. 8 at Admissions Nos. 1–4.

**2. Defendants both followed the same essential policy and practice when taking and selling tax-delinquent properties and denying former owners any way of claiming just compensation for the surplus proceeds.**

The Counties acquired the properties at issue in this action through essentially identical foreclosure processes. As representatives from both Counties have testified, each property was subject to an identical process: the Counties gave notice of delinquency, initiated foreclosure actions, obtained entry of judgment, let a statutory two-year redemption period pass, and then took title to the property. Ex. 7 at 31:20–34:22; Ex. 12 at 24:16–27:12. At no point in that process did either county inform property owners that it intended to sell the property after taking it, that a surplus could result from such a sale, or that the county would keep any surplus value. Ex. 7 at 35:2–36:16; Ex. 8 at Admissions Nos. 1–4; Ex. 12 at 29:2–10, 30:16–31:4.

After the properties were deeded to the Counties, Oregon law gave them the same options for disposing of each property: the Counties could retain the property for public use, donate it, or sell it. Ex. 13 (Dep. Tr. of Helene Lulich, Josephine County Property Manager) at 42:16–43:6; Ex. 14 (Dep. Tr. of Terry Wells, Klamath County Property Manager) at 39:25–43:1. Both Counties typically opted to sell foreclosed properties through auction, *e.g.*, Ex. 13 at 70:1–5; Ex. 14 at 59:17–27, though they took slightly different approaches to getting the properties to auction.

Klamath's process was straightforward. Its longstanding practice was to sell tax-foreclosed properties at public auction the same year they were deeded to the County, putting all foreclosed properties not retained for public use on a master auction list approved by the Board of Commissioners. *See*, *e.g.*, Ex. 14 at 44:18–22, 52:25–53:4, 59:17–61:21. Klamath's sale process accorded with state law, which required that, if a county chose to sell a foreclosed property, it do so through a public auction unless the property had little value, was unbuildable, or otherwise met the statutory requirements for an alternative disposition. *See* Ex. 14 at 82:21–83:3; *see also* ORS §§ 275.110, 275.200, 275.225.

Josephine, as a matter of policy and practice, auctioned the properties it took but via an additional step intended to circumvent ORS § 275.275, which required counties in some circumstances to distribute, to local taxing districts, funds in an amount equal to some of the surplus sale proceeds. Josephine's Property Manager, Helene Lulich, testified that, for many properties, Josephine would first designate foreclosed properties to its parks, forestry, or recreation departments before selling them, under a statute meant to allow counties to keep the sale proceeds for those departments rather than distribute them in accordance with ORS § 275.275:

> In my history of being with the county, many of the foreclosure properties were either designated to Parks or Forestry [so that the] proceeds from [the sale of] those properties, after paying expenses, the proceeds would go to the Parks Department or the Forestry Department.
>
> . . .
>
> [I]f the county did not designate them, then the proceeds would follow the statute that was in place that would tell you [where] they

> would go to—I think they first went to pay expenses, and then they went to pay the taxes and the fees, and . . . [then] they would distribute them out to the different taxing entities.

Ex. 13 at 46:15-47:15.[1]

However, Lulich further testified that Josephine County neither used nor intended to use these properties for the public purposes for which they had been designated. *Id.* at 54:24–55:5. Rather, Josephine had always intended to sell the properties. *Id.* at 45:24–46:4. Consistent with that intent, the County sold the properties either at auction or, if an auction failed to generate a sale, in private sales. *Id.* at 54:24–55:7; 69:22–70:5; 82:16–24. Once Josephine sold such properties, it could keep the proceeds "for maintenance and improvement of existing park and recreation lands or future acquisition of lands to be set aside for park or recreational purposes," ORS § 275.330(2), which it did, *see e.g.*, Ex. 6 ¶¶ 1(b), 6 (directing that proceeds from the sale of the Gabbert Plaintiffs' property—205 S. Marble Drive—be deposited into Josephine accounts designated for Parks, Forestry, and Public Works).[2]

---

[1] ORS § 275.320 permitted "[t]he governing body of a county [to] designate as county forests, public parks or recreational areas any real property . . . acquired by the county for delinquent taxes or otherwise." The distribution requirements of ORS § 275.275, however, did not apply to such properties. By its terms, § 275.275 covered only sale proceeds that counties received "under ORS 275.090 to 275.290 and 275.296 to 275.310," which did not encompass § 275.320. ORS § 275.275(1).

[2] Notably, Josephine County previously sought dismissal of this action on the ground that it could not have retained Plaintiffs' and putative class members' surplus proceeds because it was required to distribute such proceeds in accordance with ORS § 275.275. *See Lynch* ECF 164 at 4 (Josephine (and Klamath) "had no choice but to comply with Or. Rev. Stat. § 275.275 and disburse surplus to other taxing authorities rather than to property owners."). As the above discussion shows, that representation was, at best, materially misleading.

After Josephine and Klamath Counties sold foreclosed properties for amounts exceeding the deductible tax debt, statutory fees and penalties, and out-of-pocket costs, they provided former owners neither a means to recover nor any opportunity to claim the surplus proceeds. Ex. 8 at Admissions Nos. 1–4.

### 3. From the evidence Defendants have disclosed in discovery, Plaintiffs can readily identify all properties included in the putative class and calculate, formulaically, the surplus proceeds to which each class member is entitled.

Exhibit 1, provided by Josephine in discovery, is a spreadsheet that lists all 29 properties deeded to Josephine from October 12, 2017, to the present—the putative class period that is based on the Court's current statute-of-limitations ruling (the "Josephine List"). *See* Ex. 13 at 56:9–57:9 (testifying that this document includes all properties that have been deeded to Josephine since October 2017).[3] Of those 29 properties, Josephine sold 17 to persons other than the former property owners. *See* Ex. 1; Ex. 13 at 123:8–14.

Josephine also has provided all information necessary to calculate, in a formulaic manner, the surplus proceeds owed to putative class members. The "Sale Price" column in the Josephine List identifies the sale price of each sold property. *Id.* In response to an interrogatory by Plaintiffs, Josephine also identified all amounts that it claims it may deduct from the sale price of each property to calculate the surplus proceeds. Josephine entered the relevant figures into the

[3] Should the Court rule that the statute of limitations for sold-property claims begins to run upon sale of the property, Plaintiffs will request a very limited period of additional discovery for both Defendants to supplement their lists of deeded properties to encompass a class period that covers all properties *sold* since October 12, 2017.

Josephine List and a second spreadsheet, and it also produced the documents underlying those figures. *See* Ex.1; Ex. 15 (Defs.' Supp. Responses to Pls.' Second Interrogs.) at Rog. No. 8; Ex. 16 (Josephine County Spreadsheet Produced in Response to Interrogatory No. 8 Listing Claimed Allowable Costs). The categories of deductions claimed by Josephine are as follows.

First, as Plaintiffs agree, Josephine may deduct the tax debt at the time each property was deeded to Josephine, which is indicated in the Josephine List in the "Lien Amount" column and also is documented in the underlying records produced by Josephine. Ex. 13 at 127:7–25.[4]

Second, Josephine claims it may deduct out-of-pocket expenditures incurred in maintaining and selling the properties. This includes cleanup costs, which are listed in the "Cleanup" column in Exhibit 16, *see* Ex. 13 at 136:6–137:22, and documented in underlying records, *id.* at 134:8–135:13. It also seeks to deduct administrative costs purportedly incurred in maintaining and selling the property, which are reflected in the "Property Administration and Sales" column. Ex. 16. Josephine calculated those costs in one of two ways, depending on when the property was sold: Josephine at first applied a flat management cost of 10% of the

[4] Josephine County's Property Manager initially testified that the "Lien Amount" column in the Josephine Spreadsheet indicates the tax debt the former property owner owed. Ex. 13 at 127:7–25. However, its Rule 30(b)(6) representative later testified that this was incorrect and that she could not verify what information that column represented. Ex. 7 at 22:15–23. The County's representative further testified that the "Taxes and Fees" column in the spreadsheet attached as Exhibit 8 to this Motion reflects the total taxes and fees owed at the time the foreclosed properties were deeded to the County. *Id.* at 22:25–23:25. In any event, Josephine agreed to respond to an interrogatory explaining how the total tax liability through the date of deeding can be calculated from the tax debt listed in the foreclosure judgments that were produced in discovery.

sale price but later began using a formula that assigned costs based on criteria such as "Acquisition Complexity," number of auctions, and "Transaction Complexity." Ex. 17 (Josephine County Spreadsheet Cost Calculator Parameters); Ex. 13 at 97:20–98:12. Plaintiffs agree that Josephine may deduct out-of-pocket expenditures supported by invoices or receipts, but they will contest deductions based on arbitrarily derived property management or administrative fees. This is discussed further in the Argument section below. *See infra* pp. 27–29.

Klamath County also has provided a spreadsheet, and underlying records, that identify the relevant properties and document their sale prices, their tax liabilities, and Klamath's out-of-pocket costs associated with maintaining and selling the properties. The spreadsheet is attached as Exhibit 2 (the "Klamath List").

The Klamath List shows all 616 properties that have been deeded to Klamath County since October 2017. *See* Ex. 12 at 67:8–24, 91:12–25. The spreadsheet lists both properties that Klamath has sold and properties it has not yet sold. The sold properties have a positive dollar figure in Column G, "SALE PRICE," while the unsold properties have "0.00" entry in that column. *See* Ex. 2; Ex. 12 at 57:10–25.

Like Josephine County, Klamath County also has identified, in response to Plaintiffs' interrogatory, all amounts it believes it may deduct from the proceeds of sold properties and that therefore are not properly considered part of any surplus proceeds; it has listed these amounts in the Klamath List. *See* Ex. 2; Ex. 15 at Rog No. 8. In Columns H and I, "TAX LIABILITY" and "FEES," the Klamath List

identifies the tax debt connected with each property at the time it was deeded to Klamath and the associated statutory fees and penalties. Ex. 2; Ex. 12 at 69:8–19. Columns J through R identify Klamath's claimed out-of-pocket expenditures: special assessments, homeowners association fees, senior deferral payments, tax administration, eviction expenses, property cleanup costs, property management fees, and sale-related publication and software costs. Ex 2; Ex. 14 at107:23–117:19, 111:25–112:8; Ex. 12 at 88:11–90:20. The County has stipulated that it will no longer seek to deduct accrued interest or legal fees, which appeared in an earlier version of the Klamath List, from the surplus proceeds calculations. Ex. 18 (Stipulation, Aug. 27, 2026) ¶ 4. As in the case of Josephine, Plaintiffs agree that Klamath may deduct tax liabilities, fees and penalties, and out-of-pocket expenditures but will contest deductions based on arbitrarily derived property management or administrative fees, as discussed below. *See infra* pp. 27–29.

**4. The Counties continue to hold unsold properties but intend to sell them at auction imminently.**

Klamath still holds title to 71 properties it took in accordance with the above-discussed tax-foreclosure practices from October 2017 to the present. These are the properties in Exhibit 2 with a "0.00" entry in the "SALE PRICE" column (except for those few properties with notes indicating they were deeded to other governments). Most of these properties were deeded to Klamath shortly after the 2023 *Tyler* decision, but still early enough that they are not covered by Oregon's new statutory framework that governs how counties must dispose of tax-foreclosed property and surplus proceeds going forward. *See* Ex. 14 at 137:20-138:12; Ex. 15 at Rog. No. 10

(identifying only properties deeded in January 2026 as covered by H.B. 2089 (2025)). For several years, Klamath did not try to auction the properties due to an initial post-*Tyler* moratorium on selling taken properties. *See* Ex. 14 at 137:2–19. However, Klamath intends to auction these properties by the end of the current fiscal year—that is, by June 30, 2027. *Id.* at 144:12–145:3. Once Klamath sells these properties, any former holders of interest in a property with surplus proceeds will be encompassed by the proposed class definition.

## ARGUMENT

As shown below, the proposed class—under either of the definitions proposed in the alternative—satisfies the requirements of Federal Rules of Civil Procedure 23(a) and 23(b)(3), and the Court should appoint Plaintiffs Matthew Gabbert, Kelly Gabbert, and Darren Mitchell as class representatives and the undersigned as class counsel.

### 1. Preliminarily, the Court should reconsider its previous statute-of-limitations ruling and hold that the limitations period for *Tyler* claims based on sold properties begins to run only once the property is sold and the surplus proceeds are realized.

"As long as a district court has jurisdiction over the case, then it possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient." *Hartzell v. Marana Unified Sch. Dist.*, 130 F.4th 722, 741 (9th Cir. 2025) (quoting *City of Los Angeles v. Santa Monica Baykeeper*, 254 F.3d 882, 889 (9th Cir. 2001)).

Previously, in ruling that Plaintiffs had stated valid takings claims under the United States and Oregon Constitutions, this Court further ruled that such claims

accrued, and the statute of limitations began to run, "at the expiration of the redemption period, when the Counties were deeded the properties and the property owners' rights were completely extinguished." *Lynch v. Multnomah Cnty.*, No. 1:23-cv-01434-IM, 2024 WL 5238284, at *9 (D. Or. Dec. 27, 2024).

This Court should now rule instead that, at least for properties that the counties sell, the statute of limitations begins to run on the date the county sells the property and the surplus proceeds to which the takings victim is entitled are realized. Since this Court made its ruling, the Second Circuit has held that the statute of limitations on "a claim for surplus equity under *Tyler*" does not begin to run "until the [government] received (and began to 'retain') the money from the sale of the property." *Sikorsky v. City of Newburgh*, 136 F.4th 56, 62 (2d Cir. 2025). Citing *Tyler*'s dictate that "[t]o withhold the surplus from the owner would be to violate the Fifth Amendment," *Tyler*, 598 U.S. at 643 (quoting *United States v. Lawton*, 110 U.S. 146, 150 (1884)), the Second Circuit reasoned that since the "'harm' at issue is the municipality's *retention* of surplus equity," a claim is not ripe until the property is sold, a surplus is realized, and that surplus is retained. *Sikorsky*, 136 F.4th at 62 (emphasis in original). In addition, the Supreme Court held this June that just compensation for property that the government forecloses on and sells is "the actual tax-sale price" rather than "hypothetical fair market value." *Pung v. Isabella Cnty.*, 146 S. Ct. 1964, 1966 (2026).

The way the facts of this case have developed in discovery shows why the Second Circuit's holding that the statute of limitations on sold-property *Tyler* claims

begins to run at sale makes the most sense. As discussed above, Klamath County still retains title to more than 70 properties that were deeded to it in 2023 or earlier, though it intends to sell those properties by June 2027. *See supra* pp. 12–13. Once the County sells those properties, the former owners will become part of the proposed class. Until then, however, they are in limbo. The *terms of the sale* will determine whether any damages exist at all because, if a property is sold for less than the tax debt, no claim under *Tyler* or *Pung* exists. And the *timing* of the future sale will determine *when* damages can be litigated, if any materialize.

This predicament underscores why the statute of limitations for *Tyler* claims based on sold property should not begin to run until the government sells the property. Consider a takings victim whose property was deeded to Klamath County in October 2023 and who filed suit the following month. What remedy would she be entitled to seek? If she argued that just compensation should be measured by the property's real market value, less taxes and costs, Klamath could reasonably respond that it intended to sell the property, not retain it. Klamath would then argue that the former owner's claim was premature, because the Supreme Court held in *Pung* that the sale price rather than real market value will determine the amount of surplus to which the former owner is entitled when the property is sold. Klamath could argue that the suit could not proceed until the property was sold and the *Pung*-required damages calculation could be made. Under this Court's current statute-of-limitations ruling, however, the former owner would need to bring the lawsuit years before that happened in order for the claim to be timely.

A court confronted with such a suit would have two options. It could stay the action until Klamath sold the property, which in this case would mean almost four years, or it could allow the owner to proceed on the theory that, because the property remained unsold, damages should be measured by the property's real market value notwithstanding the County's intention to sell it in the future. The first option would force courts to impose years-long stays, which are disfavored. *See, e.g.*, *Dependable Highway Express, Inc. v. Navigators Ins. Co.*, 498 F.3d 1059, 1067 (9th Cir. 2007) (recognizing "general policy favoring stays of short, or at least [of a] reasonable, duration" and concluding district court erred "by issuing a stay without any indication that it would last only for a reasonable time"). It would also mean that, at the time suit was filed, the property owner arguably could not "obtain relief," as accrual rules require, because under *Tyler* and *Pung* the seizure of a foreclosed property that will be sold does not "result[] in damages" unless and until the property is sold for a profit. *Wallace v. Kato*, 549 U.S. 384, 388, 391 (2007) (internal quotation marks omitted).

The second option would create substantial practical difficulties. If the owner prevailed and recovered compensation based on a judicial determination of real market value, but the county later sold the property for a substantially lower amount, the judgment would not reflect the measure of compensation that *Pung* instructs courts to apply after a sale. Would the County then be entitled to reopen the judgment and seek a reduction in damages? If the property sold for less than the taxes owed, could the County seek to vacate the judgment? Such uncertainty for

litigants, and such prospect of wasteful litigation, is undesirable for a system meant to promote efficiency and fairness. The better approach would be to hold that a takings victim need not sue the government that committed the taking until the government sells the property.

This is analogous to the rule the Supreme Court has adopted for other takings where damages are uncertain at the outset. *United States v. Dickinson*, 331 U.S. 745 (1947), involved property owners whose land was progressively inundated after the government built a dam that raised river levels. *Id.* at 746–747. Because the flooding increased over time and the ultimate extent of the damage was uncertain at the start, the Supreme Court held that such an owner was not required to sue immediately or bring piecemeal litigation but rather could wait to sue until after "the situation becomes stabilized" and "a final account may be struck." *Id.* at 749; *see Boling v. United States*, 220 F.3d 1365, 1371 (Fed. Cir. 2000) ("[D]uring the time when it is uncertain whether the gradual process will result in a permanent taking, the plaintiff need not sue, but once it is clear that the process has resulted in a permanent taking and the extent of the damage is reasonably foreseeable, the claim accrues and the statute of limitations begins to run.").

The Court's holding accounted for many of the same concerns present here. Forcing the victim of this kind of taking to sue when the flooding began would require him to litigate amid "the uncertainty of the damage and the risk of res judicata against recovering later for damage as yet uncertain." *Dickinson*, 331 U.S. at 749. Even if an action could have been brought at the start of the flooding, this

was "not a good enough reason [to require the property owner to] sue then or have, from that moment, the statute of limitations run against him." *Id.* The same is true here. Requiring a property owner to file suit years before the property is sold would invite piecemeal and premature litigation of uncertain damages.

Holding that the limitations period in a sold-property case begins to run only after sale does not necessarily require different *accrual* rules for sold and unsold properties. This is because the moment of accrual is not always the same as the moment when the statute of limitations begins to run. For example, the Supreme Court has observed that a victim of a false arrest generally knows he was falsely arrested and thus can sue "immediately upon his false arrest," but because he "may not be able to sue while he is still imprisoned," the limitations period does not begin to run until his false imprisonment ends. *Wallace*, 549 U.S. at 389, 390 n.3. Likewise here, even if *Tyler* takings victims will generally know at the time the redemption period expires that they potentially have surplus *equity* in their taken properties, *see Lynch*, 2024 WL 5238284, at *11, it would be, as shown above, inefficient and unworkable to require those individuals to sue once their property is deeded to a county when a future sale makes the amount of just compensation owed uncertain.

Ultimately, regardless of how this Court rules on this statute-of-limitations issue, the Rule 23 analysis below is the same, because the applicable statute of limitations will affect only the size of the class, which will be sufficiently numerous either way.

## 2. Applicable legal principles

### 2.1. Standards for certifying a class

"Under Rule 23, a class action may be maintained if the four prerequisites of Rule 23(a) are met, and the action meets one of the three kinds of actions listed in Rule 23(b)." *White v. Symetra Assigned Benefits Serv. Co.*, 104 F.4th 1182, 1191 (9th Cir. 2024) (quoting *Van v. LLR, Inc.*, 61 F.4th 1053, 1062 (9th Cir. 2023)).

To satisfy Rule 23(a), plaintiffs seeking class certification must show that:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Once the requirements of Rule 23(a) are satisfied, "[a] class action may be maintained if . . . the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b), (b)(3).

### 2.2. The elements of federal and state takings claims

"The Takings Clause, applicable to the States through the Fourteenth Amendment, provides that 'private property [shall not] be taken for public use, without just compensation.'" *Tyler*, 598 U.S. at 637 (alteration in *Tyler*) (quoting

U.S. Const., amend. V) (cleaned up). "To state a claim under the Takings Clause, a plaintiff must establish the following: (1) the plaintiff must own 'private property' as contemplated under the Takings Clause; (2) that private property must be taken for 'public use'; and (3) the taking entity must not have paid 'just compensation' for it." *Zeyen v. Bonneville Joint Dist.*, 114 F.4th 1129, 1139 (9th Cir. 2024).

This Court has already held that the takings alleged in this case violated the Fifth Amendment's Takings Clause. *See Lynch*, 2024 WL 5238284, at *7. This ruling was based on *Tyler*, in which the Supreme Court held that when the government takes tax-delinquent property, sells it, and then keeps the surplus proceeds, as here, it has committed a taking. While a county may "sell [a former owners]'s home to recover the unpaid property taxes," it cannot "use the toehold of the tax debt to confiscate more property than was due," or else it "effect[s] a 'classic taking in which the government directly appropriates private property for its own use.'" *Tyler*, 598 U.S. at 639 (quoting *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 324 (2002)). The victim of such a taking "is entitled to just compensation." *Id.*

This Court also has held that the takings at issue violated the Takings Clause of the Oregon Constitution, which provides that "[p]rivate property shall not be taken for public use . . . without just compensation." *Lynch*, 2024 WL 5238284, at *16 (quoting Oregon Const., art. I, § 18).

When a county takes and sells a tax-foreclosed property, just compensation is "the difference between the sale price and the taxpayer's debt." *Pung*, 146 S. Ct. at 1967.

### 3. The proposed class satisfies the four requirements of Rule 23(a).

#### 3.1. Numerosity/impracticability (Fed. R. Civ. P. 23(a)(1))

This factor "requires examination of the specific facts of each case and imposes no absolute limitations." *A. B. v. Haw. State Dep't of Educ.*, 30 F.4th 828, 835 (9th Cir. 2022) (quoting *Gen. Tel. Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318, 330 (1980)). While plaintiffs thus "need not provide an exact number of class members" to show numerosity, *Moss v. U.S. Secret Serv.*, No. 1:06-cv-3045-CL, 2015 WL 5705126, at *3 (D. Or. Sept. 28, 2015), "a class of 40 or more members creates a presumption of impracticability of joinder in the Ninth Circuit," *Hanney v. Epic Aircraft, LLC*, No. 6:21-cv-01199-MK, 2024 WL 2106210, at *1 (D. Or. May 10, 2024); *accord, e.g., Lott v. Vial Fotheringham*, LLP, No. 3:16-cv-00419-HZ, 2020 WL 1890539, at *2 (D. Or. Apr. 15, 2020).

Either of the proposed alternative classes easily satisfies the numerosity/impracticability requirement. The class proposed based on the Court's current statute-of-limitations ruling includes more than 600 properties (and will contain more once Klamath auctions its 70-plus unsold properties). And because more than one person or entity has an interest in many of the properties at issue, the number of putative class members substantially exceeds the number of properties. In several recent settlements involving *Tyler* class-action claims like

these, the number of potential class members has been roughly four times the number of properties involved. *See, e.g.*, ECF 231–2 at 4 (claims administrator attesting that, in settlements involving 177 properties, class included 678 potential members once heirs and other interest holders were identified). Were this Court to adopt Plaintiff's proposed class definition based on a reconsidered statute-of-limitations ruling, the class would be even larger. Either way, the putative class well exceeds the size that makes joinder of all class members impracticable.

**3.2. Commonality (Fed. R. Civ. P. 23(a)(2))**

The commonality requirement is "construed permissively," *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998)); *Moss*, 2015 WL 5705126, at *3, making commonality "a low hurdle easily surmounted," *Pecover v. Elec. Arts Inc.*, No. C 08–2820 VRW, 2010 WL 8742757, at *13 (N.D. Cal. Dec. 21, 2010) (quoting *Scholes v. Stone, McGuire & Banjamin*, 143 F.R.D. 181, 185 (N.D. Ill. 1992)). "Plaintiffs need not show that every question in the case, or even a preponderance of questions, is capable of classwide resolution." *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014) (quoting *Wang v. Chinese Daily News*, 737 F.3d 538, 544 (9th Cir. 2013)). "[E]ven a single common question will do," *id.* (quoting W*al-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011)), so long as that question is "apt to drive the resolution of the litigation," *id.* (quoting *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 962 (9th Cir. 2013)).

Here, several questions of law and fact are common to the proposed class and are apt to drive the resolution of this litigation. Specifically, the following questions go to the heart of Defendants' liability:

- whether each of the Defendants had a policy or practice of seizing and selling real property to satisfy unpaid property tax debts and then failing to justly compensate the former owners for the surplus sale proceeds;
- whether Defendants' retention of surplus proceeds and/or distribution of funds equal to such proceeds constitutes public use in the takings context;
- whether the above-described policy or practice violates the United States Constitution's prohibition on the government's taking of property for public use without paying just compensation;
- whether such a policy or practice violates the Oregon Constitution's prohibition on the government's taking of property for public use without paying just compensation;
- whether just compensation for properties Defendants sold is equal to the sale price, less outstanding taxes, interest on such taxes, statutory fees and penalties, and out-of-pocket expenses incurred in maintaining and preparing the properties for sale after the takings occurred; and
- whether Defendants may deduct, from the just compensation owed to class members, alleged administrative and overhead expenses where they did not maintain contemporaneous records of such expenses and did not track time spent on individual properties (as discussed in Section 4.1, below).

### 3.3. Typicality (Fed. R. Civ. P. 23(a)(3))

"The test of typicality 'is whether other members have the same or similar injury [as the class representatives], whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Ellis*, 657 F.3d at 984 (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). Put differently, "[t]ypicality

refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Id.* (quoting *Hanon*, 976 F.2d at 508).

Here, the class representatives and putative members of each class are all victims of the same course of conduct and suffered the same type of injury. All class members, including the named plaintiffs and would-be class representatives, held an interest in Oregon real property, and the Defendants foreclosed on the properties for nonpayment of taxes, took title to the properties, then sold the properties and failed to justly compensate the class members for the surplus proceeds. The typicality requirement is satisfied.

**3.4. Adequacy (Fed. R. Civ. P. 23(a)(4))**

"The adequacy-of-representation requirement 'tend[s] to merge' with the commonality and typicality criteria," since those requirements indicate "'whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982)). This requirement also can be analyzed "in part by considering the 'competency and conflicts of class counsel.'" *Kelly v. Aramark Servs., Inc.*, 815 F. Supp. 3d 1043, 1050 (N.D. Cal. 2025) (quoting *Amchem Prods., Inc.*, 521 U.S. 591 at 626 n.20). This Court thus should ask: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel

prosecute the action vigorously on behalf of the class?" *Ellis*, 657 F.3d at 985 (*quoting Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)).

Here, the class representatives understand their duties and have diligently fulfilled them throughout this litigation. Since 2023, they have actively participated in the case and have even declined opportunities to resolve their individual claims in order to continue pursuing relief on behalf of the class as a whole. Ex. 19 (Decls. of Plaintiffs Matthew Gabbert, Kelly Gabbert, and Darren Mitchell). Moreover, there are no conflicts between the class representatives or class counsel, on the one hand, and the class members, on the other. All parties' interests are aligned in obtaining the greatest possible recovery from the defendant counties. Class counsel are experienced class action litigators who have capably and zealously represented the proposed classes. This is demonstrated, in part, by the exceptional settlements class counsel have secured for similar classes of individuals in this action and related *Tyler* actions before this Court. *See* Ex. 20 (Decl. of Akeeb Dami Animashaun) ¶¶ TK. The final Rule 23(a) requirement is satisfied.[5]

[5] Some class-action defendants have argued that Rule 23(a) imposes an additional, implicit requirement that class members be "ascertainable," but the Ninth Circuit has rejected any such requirement. *See Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124 n.4, 1126 (9th Cir. 2017) (noting that Ninth Circuit "ha[s] not" "adopted an 'ascertainability' requirement," *id.* at 1124 n.4, or a "freestanding administrative feasibility prerequisite to class certification," *id.* at 1126). In any event, the class members are readily ascertainable here based on objective criteria—namely, the spreadsheets produced by Defendants that identify all the properties at issue and identify the former owners of such properties. *See* Exs. 1, 2.

### 4. The proposed class satisfies Rule 23(b)(3).

#### 4.1. Predominance

"Predominance is established where a proposed class is 'sufficiently cohesive to warrant adjudication by representation.'" *Kelly*, 815 F. Supp. 3d at 1051 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)). This inquiry "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods*, 577 U.S. at 453 (internal quotation marks omitted).

The proposed class easily satisfies this requirement. That hundreds of takings occurred can be established efficiently and formulaically, by referring to the spreadsheets Defendants have produced. These spreadsheets contain all the material facts: identifying information for each property Defendants took during the relevant period, the dates the properties were deeded to the counties, the tax debts owed on the properties, the dates on which and prices for which Defendants sold the properties, and the amounts that Defendants believe may be deducted from the surplus proceeds calculations. Even if there were no dispute about Defendants' deductible-amount figures, the spreadsheets would establish that Defendants received surplus proceeds for hundreds of properties—proceeds they concede they failed to return. Liability is easily established classwide.

Moving to damages, "[t]ime and time again, [the Ninth Circuit] has reaffirmed the principle that the need for individual damages calculations does not doom a class action." *Ridgeway v. Walmart Inc.*, 946 F.3d 1066, 1086 (9th Cir.

2020); *accord Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 (9th Cir. 2022) (en banc) ("[A] district court is not precluded from certifying a class even if plaintiffs may have to prove individualized damages at trial, a conclusion implicitly based on the determination that such individualized issues do not predominate over common ones." (citing *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016))). This is especially so when, as here, damages are a matter of "straightforward calculation" based on figures on paper and do not come close to overwhelming the common, aggregation-enabling issues in the case. *Loc. Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001).

As indicated above, Plaintiffs do dispute some of the methods that Defendants have used to identify out-of-pocket costs that they contend they may deduct from the surplus proceeds figures. But such disputes do not threaten the predominance of common issues, because these disputes do not involve fact-specific questions about individual properties. Rather, Plaintiffs challenge Defendants' practice, for a few of their claimed categories of deductions, of assigning across-the-board costs in a formulaic way. Whether such deductions are proper presents a single issue that is generalizable among all properties.

Most significant is each county's practice of assigning property-management costs. Klamath County applied a flat property-management charge, for all properties, of 15% of the sale price; the County has no records of how much time its employees actually spent managing each property. *See* Ex. 2 (Column O); Ex. 12 at

86:19–88:10; Ex. 14 at 128:2–129:8. The County's Tax Collector, and Rule 30(b)(6) representative, admitted that this figure was "arbitrary." Ex. 12 at 86:23–87:5; *see also id.* at 103:13–113:20 (attempting to walk back prior admission that the figure was arbitrary after speaking with counsel, but failing to identify any objective basis for the figure).

Josephine County has likewise applied a flat 10% charge to some properties, while similarly keeping no records of time actually expended. Ex. 7 at 54:7–55:8. For other properties, it used a spreadsheet in which the property manager would, for each property sold, assign a value for various open-ended criteria, and a formula would generate a property-management cost. For example, if a property was occupied and required vacancy, the property manager would select either "Average" or "Complex" in the "Occupied Property" category. An "Average" designation in that category increased the amount charged against the property by 2% of the property's sale price, "Complex" increased the charge by 3%, and an additional 2% was charged if removal proceedings were initiated. *See* Ex. 17; Ex. 7 at 68:1–69:13. Although the spreadsheet creates an appearance of rigor, the formula's criteria are entirely arbitrary. Josephine's Rule 30(b)(6) representative could identify no objective basis for any of the criteria and testified that they reflected nothing more than the subjective judgment of the employees who created the spreadsheet. Ex. 7 at 63:19–78:3.

For similar reasons, Plaintiffs intend to challenge Klamath's practice of charging a flat $500 per property for time spent by the County's tax department,

without any reference to the amount of time actually spent by that department. *See* Ex. 2 (Column L); Ex. 12 at 82:17–84:8.

Resolving these disputes will not require property-specific legal rulings or factfinding but rather one determination, generalizable to all properties, about whether such methods of assigning costs are proper.[6] Once that determination is made, calculating damages will still involve formulaic calculations, applicable across the board, based on information Defendants have already compiled and produced—the dispute is simply about what that formula will be. There are no individualized damages issues that undermine predominance.

**4.2. Superiority**

"[T]he purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175–76 (9th Cir. 2010) (quoting 7AA Charles Wright, Arthur Miller & Mary Kay Kane, *Federal Practice and Procedure*, § 1779 at 174 (3d ed. 2005)). "[T]he factors relevant to assessing superiority include" those listed in Rule 23(b)(3)(A)–(D), though "[t]his list is not exhaustive." *Id.* at 1175. Ultimately, the superiority requirement is concerned with "judicial economy." *Id.* at 1176.

[6] Plaintiffs intend to introduce expert testimony showing that Defendants' cost figures are arbitrary and unsupported. Even if Defendants offer expert testimony attempting to justify those figures or substitute alternative figures, those issues necessarily must be resolved on a classwide basis. Defendants did not track the time, effort, or resources expended on any individual property, but instead relied on assumptions and formulas. As such, any methodology used to calculate property management or administrative costs would present a common question capable of a uniform answer for every class member.

The superiority requirement is satisfied here because, as discussed above, this lawsuit consists principally of legal and factual issues that can be efficiently resolved on a classwide basis. There has been little indication that class members seek to "individually control[] the prosecution or defense of separate actions." Fed. R. Civ. P. 23(b)(3)(A). Although a handful of victims of Defendants' takings have sought just compensation on their own, the vast majority of putative class members have not. Similarly, undersigned counsel are aware of no other significant "litigation concerning the controversy already begun by or against class members" in Josephine and Klamath Counties. *Id.* 23(b)(3)(B). For most putative class members, this class action is the only way they will receive compensation for Defendants' unlawful takings of their properties. "[C]oncentrating the litigation of the claims in th[is] particular forum" is "desirab[le]," as all of class members' claims arise in this District. *Id.* 23(b)(3)(C). Finally, there are few "likely difficulties in managing a class action," *id.* 23(b)(3)(D); to the contrary, as shown above, litigating this matter as a class action will be highly efficient.

**5. The Court should appoint undersigned counsel as class counsel.**

In addition to "defin[ing] the class," a certification order "must appoint class counsel under Rule 23(g)." Fed. R. Civ. P. 23(c)(1)(B). Rule 23(g) instructs the Court to consider:

> (i) the work counsel has done in identifying or investigating potential claims in the action;
>
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
>
> (iii) counsel's knowledge of the applicable law; and

> (iv) the resources that counsel will commit to representing the class . . . .

Undersigned counsel amply satisfy these criteria. As shown in the Animashaun declaration, Ex. 20, proposed class counsel have done substantial work investigating and bringing the present claims; have extensive experience handling complex class actions and civil rights matters, including being appointed, by this Court, as class counsel for other *Tyler* classes; have extensively litigated the legal issues relevant to this matter and thus know the applicable law well; and have committed, and will continue to commit, the resources necessary to representing the class.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court certify the proposed class and appoint undersigned counsel as class counsel.

[Signatures on next page]

Dated: September 9, 2026

Respectfully submitted,

/s/ Akeeb Dami Animashaun
Akeeb Dami Animashaun
355 S. Grand Ave., Suite 2450
Los Angeles, California 90071
dami@animashaun.me
929-266-3971

Michael Zhang
Qiu-Qiu Law
5020 Martin Luther King Jr. Blvd., Suite S
Portland, Oregon 97211
michael@qiu-qiulaw.com
908-938-6683

Jacob Loup
Law Office of Jacob Loup
400 Corporate Pointe, Suite 300
Culver City, California 90230
jl@louplaw.com
347-391-5009

Shakeer Rahman
Law Office of Shakeer Rahman
3435 Wilshire Blvd., Suite 2910
Los Angeles, California 90010
shakeer@loosr.net
323-546-9236

*Counsel for Plaintiffs and Proposed Class Counsel*